## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. JAMES HOHM | ) ) ) | CASE NO.: 5:18-CV-516 |
| Plaintiff, | ) ) ) | |
| NORTHLAND ASSOCIATES, INC., NORTHLAND/JDS CONSTRUCTION, JAMES M. TYLER, and THE DIVERSE CONSTUCTION GROUP, LLC, | ) ) ) ) ) | (FILED UNDER SEAL) |
| Defendants. | ) ) ) | |

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

NOV 1 2 2019

AT_____ O'CLOCK_____
John M. Domurad, Clerk - Syracuse

### FIRST AMENDMENT TO *QUI TAM* COMPLAINT

This is the First Amended *qui tam* Complaint for Relator James Hohm ("Hohm" or "Relator") on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). In support thereof, Relator alleges the following:

### I.    INTRODUCTION

1.      Beginning on or about November 2007, Defendants Northland Associates, Inc. ("Northland"), JDS Construction ("JDS" and post-1993 "Northland/JDS"), James M. Tyler ("Tyler") and The Diverse Construction Group, LLC ("Diverse") (collectively "Defendants") engineered and implemented a "rent-a-veteran" ("rent-a-vet") fraudulent scheme that won approximately $57 million in Government designated set-aside contracts.

2.      Specifically, in 2007, Tyler, the co-founder and President of Northland and Northland/JDS, knowingly with the intent to commit fraud upon the United States (also referred to herein as the "Government") recruited Hunter Grimes ("Grimes"), a recently

bankrupted service-disabled-veteran, to help form Diverse. Ostensibly Grimes owned 51% and seven Northland employees owned 49% of Diverse. The Defendants' plan was to fraudulently use Grimes status as a disabled veteran with a small business that was "located" in an eligible Small Business Administration ("SBA") HubZone area to pursue Federal set-aside contracts.

3.      However, the truth was Grimes was a mere figurehead as he exerted no control over the day-to-day operations or the long-term strategic decisions on matters relating to Diverse. In fact, control over Diverse and its Federal set-áside projects were exerted by Tyler as well as multiple other employees of Northland, and Northland/JDS.  For example, Northland and Northland/JDS employees drafted and submitted Diverse Federal bid proposals on set-aside contracts, used Northland and Northland/JDS employees and equipment to perform work on Diverse projects, and used Northland and Northland/JDS employees to manage the payroll and benefits for employees working the same Diverse set-aside projects.

4.      Because Grimes was an owner in name only and never had control over Diverse, all certifications relating to the concern's qualified status for set-aside contracts on Federal databases were fraudulent. Additionally, besides false certifications on Diverse's qualified status, Defendants submitted or caused to be submitted false statements, false documentations, false bid proposals, and false claims for payment to the Government for three primary purposes: 1) to win Federal set-aside contracts, 2) to receive payment for work performed on set-aside contracts, and 3) to hide the fact that Diverse was a shell for Defendants in order to prolong the scheme and thereby continue reaping the financial benefits of the fraud.

5.      Defendants knowingly submitted or caused to be submitted false certifications, statements, documents, bid proposals and claims for payment, and the evidence presented by

Relator and detailed more fully below, demonstrate that on multiple occasions the Defendants took affirmative and knowing actions to facilitate the fraud and to hide the fact that Northland and Northland/JDS were controlling Diverse set-aside projects. These fraudulent actions included but were not limited to: 1) Grimes submitting a fraudulent affidavit in an SBA size determination appeal for the purpose of denying the true relationship between Defendant entities, 2) Defendants creating a shell headquarters for Diverse, their shell company, for the purposes of concealing the relationship between Defendant entities, 3) senior Northland and Northland/JDS executives ordering Northland and Northland/JDS field personnel to refrain from wearing Northland shirts or driving Northland vehicles onto Diverse jobsites, again with the purpose of concealing the relationship between Defendant entities, and finally 4) Grimes signing Diverse business records at Northland headquarters and to infrequently appear on jobsites to give the false impression that he was engaged and in control of Diverse.

6.      Pursuant to the FCA, Relator seeks to recover on behalf of the United States damages and civil penalties arising from Defendants' purposeful submission of false and fraudulent claims and certifications to the Government.

## II.   JURISDICTION AND VENUE

7.      This action arises under the FCA. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

8.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be found in, reside in, transacted business in and/or have committed the alleged acts in the Northern District of New York.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because all the Defendants can be found in, reside in or have transacted business in the Northern District of New York and many of the alleged acts occurred in this District.

10.     Relator knew of no other FCA complaint against Defendants alleging the same or similar actions at the time of the initial filing. Additionally, Hohm learned of all the conduct underlying these allegations through personal experience, conversations with colleagues, and review of the Federal Procurement Data Systems records. Accordingly, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). Hohm made voluntary disclosures to the United States prior to the filing of this lawsuit.

### III.    PARTIES

11.     The real party in interest in this case is the United States. The Government, through the its various Departments, solicited proposals from small businesses and awarded the contracts and task orders at issue in this action. As described more fully below, the Government set-aside those contracts for small businesses to foster the development of small businesses.

12.     Relator, James Hohm, is a resident of Memphis, New York. He worked in the building construction trade for 30-years. His duties fluctuated from general laborer to site superintendent. Hohm worked for JDS from 1985 through 1993. In 1993, Northland purchased JDS and at that time Relator began working for Northland/JDS.

13.     Starting in 2008, and continuing through to 2015, Northland/JDS senior management frequently assigned Relator to work on Federal set-aside construction projects. These Federal set-aside projects were fraudulently won by Defendants by using their shell

company called Diverse. Hohm was never hired by or even discussed employment with Grimes regarding working for Diverse. In fact, during this seven (7) year period, Relator had minimal contact with Grimes and received all work-related instructions from Northland and Northland/JDS executives. Additionally, Relator noted that Northland and Northland/JDS employees performed all of the work, supplied all of the equipment, and managed all of the administrative aspects of Diverse. Hohm stopped working for Defendants in November 2015.

14.     Defendant, Northland Associates, Inc., is a general contractor engaged in the building construction industry and is headquartered at 4701 Buckley Road in Liverpool, New York. Northland was started in 1982 and is a privately held New York corporation founded by brothers James and Thomas Tyler. The company exceeded Small Business Administration ("SBA") NAICS size standards and thus was listed as "other than small" in Federal databases.

15.     Defendant, Northland/JDS, is co located; with Northland at 4701 Buckley Road, Liverpool, New York 13088. The company was founded by John D. Schmidt ("Schmidt") of Pompey, New York and was originally known as JDS Construction. In 1993, JDS Construction was purchased by and operated as a division of Northland. Subsequently, and prior to 2008, Schmidt passed away and management responsibilities for Northland/JDS transferred to James Shanahan ("Shannan").

16.     Defendant, James M. Tyler, ("Tyler") of 108 County Route 84, West Monroe, New York is the 71-year old co-founder and current President of Northland. Tyler actively manages the operations of Northland, Northland/JDs, and Diverse.

17.     Defendant, Diverse was founded in New York in November 2007 by Defendants. Allegedly Grimes owned 51% of the LLC whereas seven (7) Northland employees reportedly owned 49% of the entity.  One of the Northland stockholders was a first

cousin to Tyler. Grimes was a service-disabled United States Navy veteran who went through a Chapter 7 bankruptcy in 2004. He passed away in 2015. Diverse eventually obtained status as a qualified entity for set-aside programs under the Service-Disabled-Veteran-Owned-Small-Business ("SDVOSB" or "SDVOSBC" for concerns), Small Business, and HUBZone programs. Diverse purported to provide general contracting building construction services and fraudulently won approximately $57 million in set-aside contracts from 2008 through 2015.

## IV.   REGULATORY OVERVIEW

### A. The Service-Disabled Veteran-Owned Small Business procurement program

18.     The Veterans Benefits Act of 2003 (the "Act") created a procurement program for small business concerns owned and controlled by service-disabled veterans. 48 C.F.R. § 19.1401(a). The program's purpose is to provide federal contracting assistance and opportunities to SDVOSBs in recognition of their owner's service to their country. *Id.* at § 19.1401 (b).

19.     Under the Act, government contracting officers may award contracts and task orders based on bids solicited only from SDVOSBs. 15 U.S.C. § 657f(a); see also 48 C.F.R. §6.206(a). In order to fulfill the statutory requirement of the [Act], contracting officers may set-aside solicitations to allow only [SDVOSBs] to compete. Contracts and task orders whose solicitations limit participation to SDVOSBs are generally referred to as being "set-aside."

20.     A small business is potentially eligible to bid as a SDVOSB on set-aside contracts and task orders if it meets the following ownership, control, and size criteria:

> i.     The business is majority-owned (not less than 51%) by one or more service-disabled veterans;
>
> ii.    One or more service-disabled veterans or, in the case

> of a service-disabled veteran with a permanent and
> severe disability, the spouse or permanent caregiver
> of such veteran, control the management and daily
> business operations; and
>
> iii.   At the time of the contract offer, the business is
> "small" within the size standard corresponding to
> the North American Industry Classification System
> ("NAICS").
>
> 13 C.F.R. §§ 125.8, 125.11.

21.    To satisfy the ownership criteria, a small business concern is "owned by service-disabled veterans when one or more service-disabled veterans have direct and unconditional ownership of that concern." 13 C.F.R. § 125.12(a). In the case of partnerships and limited liability companies, service-disabled veterans must own at least 51% of each class of partnership or membership interest. *Id.* at §125.12 (b).

22.    To satisfy the control criteria, a small business concern is "controlled" by service-disabled veterans when one or more service-disabled veterans (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran) conducts both the concern's long-term decision-making and its day-to-day management and administration of business operations. 13 C.F.R. § 125.l3(a).

23.    To satisfy the size criteria, a small business concern is small, and therefore eligible for federal small business programs and preferences, when it meets the SBA's size standards. 13 C.F.R. § 125.14(a). These standards have been developed for different industries under NAICS. *Id.* For industrial, commercial, and institutional building construction, the most common NAICS regulatory size standard is $36.5 million in annual receipts. 13 C.F.R. § 121.201. An industrial, commercial, and institutional building construction entity that, in conjunction with its affiliates (as described below), has annual receipts greater than $36.5

million is ineligible to compete for, or to be awarded, SDVOSB set-aside contracts. *Id.*

24. SDVOSBs may have affiliates, provided that the aggregate size of the SDVOSB and all its affiliates is still "small" as defined by the regulations. 13 C.F.R. § 125.15. For example, an industrial, commercial, and institutional building construction small business concern owned by service-disabled veterans is not an SDVOSB when it is affiliated with an entity that generates more than $36.5 million a year in revenue on its own or more than $36.5 million when combined with the revenue of the small business concern and/or other affiliates.

25. Entities are "affiliates" of each other when one entity controls, or has the power to control, the other. 13 C.F.R. § 121.103(a). Affiliation is determined by the totality of the circumstances, considering factors such as ownership, management, previous relationships or ties to the other entity, and contractual relationships. *Id.* at § 121.103(a)(5).

26. For example, entities may be affiliated through common management when one or more of the officers, directors, managing members or partners who control the board and/or management of a concern also control the board and/or management of another concern. *Id.* at § 121.103(e).

27. For purposes of affiliation, control can be both affirmative and negative. "Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *Id.* at § 121.103(a)(3).

28. When an SDVOSB is the prime contractor on an SDVOSB general construction contract, it may subcontract part of the contract, if it spends at least 15% of the total personnel cost on the concern's employees or the employees of the other SDVOSBs. 13

C.F.R. § 125.6(a)(3). Whereas when the SDVOSB is the prime contractor on an SDVOSB

contract for construction by special trade contractors, it must spend at least 25% of its

personnel costs on its employees or the employees of the other SDVOSBs. *Id.* at § 125.6(a)(4).

29.     An SDVOSB must meet several requirements to submit an offer on a set-aside

contract. Specifically, the SDVOSB must expressly represent: (a) that it is indeed an

SDVOSB; (b) that it is "small" as defined by the regulations; (c) that it will meet the

percentage of work cost expenditures for subcontracting; and, if applicable, that it is an

eligible joint venture and/or non-manufacturer. 13 C.F.R. § 125.18(a).

30.     All bids, proposals, and applications for any SDVOSB award are deemed

affirmative, willful, and intentional certifications of SDVOSB status:

> i.   Submission of a bid, proposal, application or offer
>      for a Federal grant, contract, subcontract, cooperative
>      agreement, or cooperative research and development
>      agreement reserved, set-aside, or otherwise classified
>      as intended for award to SDVOSBCs.
>
> ii.  Submission of a bid, proposal, application or offer
>      for a Federal grant, contract, subcontract, cooperative
>      agreement or cooperative research and development
>      agreement which in any way encourages a Federal
>      agency to classify the bid or proposal, if awarded, as
>      an award to a SDVOSBC.
>
> iii. Registration on any Federal electronic database for
>      the purpose of being considered for award of a
>      Federal grant, contract, subcontract, cooperative
>      agreement, or cooperative research and development
>      agreement, as a SDVOSBC.
>
> 13 C.F.R. § 125.32(b).

31.     A signed certification representing SDVOSB status must be included on all

submissions during a SDVOSB bid process. *Id.* at § 125.32(c).

32.     Each SDVOSB set-aside contract contains provisions specifying that: "[o]ffers

are solicited only from service disabled-veteran-owned small business concerns." 48 C.F.R. §

52.219-27(c)(1). Additionally, the regulation expressly states that the offers received from

concerns that are not SDVOSB shall not be considered. *Id.*

33.     To protect the integrity of the SDVOSB set-aside program, fraud involving the

program is expressly actionable under the FCA. 13 C.F.R § 125.32(e)(2).

**B.  SBA HUBZone program**

34.     The Historically Underutilized Business Zones ("HUBZone") set-aside

program was enacted as part of the Small Business Reauthorization Act of 1997. The program

is designed to promote economic development and employment growth within designated

distressed areas. Additionally, the rules establish contract award preferences for Government

procurement so long as a business meets the programs' stringent criteria.

35.     Similar to the SDVOSB program, the HUBZone program requires that a

"concern, together with its affiliates...qualify as a small business under the size standard

corresponding to its primary industry classification." 13 C.F.R. § 126.200(b)(2). Therefore, the

same annual receipts limitations referenced above applies to the HUBZone program for

industrial, commercial, and institutional building construction companies. 13 C.F.R. §

121.201. The concern together with its affiliates must meet the size standards at the time of

initial application for certification as well as at the time of initial contract offer. 13 C.F.R. §

126.203(a).

36.     The HUBZone program applies the same principles for establishing affiliates

as cited above for the SDVOSB program. 13 C.F.R. § 121.103(a)(l). Affiliation is based on

control and determined by the totality of the circumstances, considering factors such as

ownership, management, previous relationships or ties to the other entity, and contractual

relationships. *Id.* at § 121.103(a)(5). For example, entities may be affiliated through common management when one or more of the officers, directors, managing members or partners who control the board and/or management of a concern also control the board and/or management of another concern. 13 C.F.R. § 121.103(e). Control means both the day-to-day management and long-term decision-making authority.13 C.F.R. § 126.202.

37.     The principal office for a HUBZone concern must be in a HUBZone. 13 C.F.R. § 126.200(b)(3). Also, at least 35% of HUBZone employees must reside in the HUBZone when the concern is working on a HUBZone contract. *Id.* at § 126.200(b)(4).

### C. SBA set-asides for Small Businesses

38.     In addition to setting aside contracts for the SDVOSB and HUBZone socio-economic categories, the SBA can limit competition for certain contracts to just small businesses. FAR 19.501(a). The primary reason for small business set-asides is to exclusively funnel contracts to small business concerns. *Id.* All small businesses set-aside contracts "may be open to all small businesses." *Id.*

39.     Like the SDVOSB and HUBZone programs; "[a]ll solicitations involving set-asides must specify the applicable small business size standard and NAICS code (see FAR 19.303)." FAR 19.501(f). FAR 19.303 in turn states that the "contracting officer shall determine the appropriate North American Industry Classification System (NAICS) code and related small business size standard and include them in solicitations." FAR 19.303(a)(l). For example, if the contracting office selected the same industrial, commercial, and institutional building construction category referenced above, then the NAICS size standard is $36.5 million in aggregate annual receipts for the small business and its affiliates. 13 C.F.R. § 121.201. The same affiliate standards cited above apply to small business set-asides. 13 C.F.R.

§ 12I.103(a).

## V.   FACTUAL ALLEGATIONS

40.     Since 2008, Defendants made numerous false certifications and affirmative misrepresentations to the Government to conceal the fact that Diverse did not meet the express conditions of payment for SBA set-aside contracts and task orders. In reality, Diverse was a shell company and Grimes was a mere figurehead service-connected disabled veteran with minimal to no control over Diverse. As detailed below, Diverse was created, controlled, and operated by Northland and Northland/JDS employees for the express purpose to fraudulently secure lucrative set-aside contracts through a deceptive rent-a-vet scheme.

### A. Defendants falsely certified Diverse as an SDVOSB, HUBZone Concern, and Small Business to win lucrative set-aside contracts and task orders.

41.     Hohm began working for Northland in 1993 when Northland purchased JDS, thus he has long-term, extensive familiarity with its operations. Over his twenty-plus years with Northland and Northland/JDS, Relator worked numerous projects across New York State, spanning federal, state, and private sectors.

42.     Northland is indisputably not "small" as defined by governing regulations 13 C.F.R. § 125.15. According to Northland's own internet marketing collateral: "[w]e have worked on stadiums, resorts, schools, hospitals, prisons, hangars, office buildings, parking garages, athletic facilities, convention centers, multi-unit housing, retail centers, laboratories, border crossings, museum exhibits, airports and more. We have constructed projects with values in excess of $50 million and small repair projects."

43.     During the first fifteen years of Relator's Northland career, the company competed for and won tens of millions of dollars in GSA contracts. In a 2009 GSA database

entry, Northland was reported to have at least 100 employees and annual revenue of $50 million. Additional GSA data shows that from 1985 to the end of 2007, Northland received approximately $157 million in federal government contracts. In 2007 alone, Northland received approximately $53.5 million in federal construction awards. Finally, from 2007 to the present, Northland continued to be listed in the GSA database as "other than small business."

44.    Ultimately, the above numbers merely reflect federal contract awards and do not include the tens of millions of dollars won annually in the state and private sectors. Therefore, Northland could not qualify as "small" under 13 C.F.R. § 125.15 because its annual revenues far exceeded the regulatory annual receipts maximums of $15 million and $36.5 million for the NAICS industry codes connected to the set-aside contracts detailed below.

45.    Northland circumvented the governing regulations by forming Diverse in 2007 with Grimes serving as the rent-a-vet figurehead. On paper, Grimes owned 51% of the company and would control the projects, while seven Northland employees owned 49% of the concern. In reality, Northland employees controlled Diverse's operations and profits, and Grimes had no control. Defendants therefore falsely certified that Diverse was an SDVOSB seeking an SDVO contractual relationship with the United States government when in or about the Spring of 2008 it initially registered for participation in the Government's Central Contractor Registration ("CCR") and the Online Representations and Certifications Applications ("ORCA") databases.

46.    Further, Defendants repeated these false certifications from 2008 until July 2012 on the CCR and ORCA databases. Starting in August 2012 and continuing until at least 2016, Defendants annually certified Diverse as a qualified SDVOSB, HUBZone, and Small Business concern on the Government System for Award Management ("SAM"), which

replaced CCR and ORCA as the primary supplier database for the Federal Government.

47.     Upon achieving SDVOSB qualified status, Diverse began bidding on SBA set-aside contracts while Northland wound down its GSA work. This led to Defendants winning Diverse's first SDVOSB set-aside contract on June 13, 2008. The project involved a parking garage at the VA Medical Center in Syracuse, which was a $10.2 million contract (contract ID #VAI01 183B4C003l). That same year Northland experienced a corresponding drop in federal contracts; falling from $53.5 million to approximately $1 million.

48.     By 2010, Northland ceased receiving new Federal contracts as it was busy working large private and state contracts and servicing existing Federal contract modifications. Meanwhile, during this same period, Diverse, the fraudulent shell, won over $26 million in SDVOSB and HUBZone set-aside contract. Subsequently, in 2011, Defendants won their first Small Business set-aside contract when the DOA awarded a construction project valued at over $13 million to Diverse under contract ID # W912QR11C0011. This pattern of Northland focused on winning private and state sector projects and Diverse pursuing Federal set-aside contracts continued until Grimes passed away from cancer in the fall of 2015.

49.     In June 2017, Northland in a joint venture with Cianbro Corporation of Maine, won a $215 million federal award for the border crossing project at Alexandria Bay, New York.

**B. Grimes materially misrepresented the relationship between Northland and Diverse to the SBA and the SBA Office of Hearings and Appeals.**

50.     On September 30, 2009, Diverse won HUBZone set-aside contract ID# W912PQ09C0045 valued at $9,305,882. This contract involved a construction project at Fort Drum, New York. After Diverse won the bid, a HUBZone-qualified bidder, ConTech Building

Systems, Inc. ("ConTech"), lodged a protest with the SBA. ConTech alleged that Diverse was not qualified to bid because it was improperly affiliated with Northland.

51.     Ultimately, the SBA Contract Officer ("CO") dismissed the protest, however, at the same time the CO requested a formal size determination for Diverse. Upon completing its assessment in November 2009, the SBA's Area Office ("AO") determined under the totality of circumstances test that Diverse was not small as defined under the SDVOSB program. Additionally, the AO found that Diverse was owned 51% by Grimes and 49% by seven Northland employees. Furthermore, the AO found that Diverse won five (5) SBA set-aside awards over the two (2) year period from its foundation in 2007 through 2009. Most importantly, the record indicated that all five (5) projects involved a contractual relationship between Diverse and Northland.

52.     Diverse appealed the AO findings and to that end Grimes submitted a declaration asserting:

      i.    Diverse is not controlled by Northland;

     ii.    Diverse receives no financial or other assistance from Northland;

    iii.    Diverse is in no way reliant upon Northland;

    iv.    There is no common ownership or management between the two companies; and

     v.    The two companies share no employees.

53.     Furthermore, Grimes stated that by the end of 2009, all contractual relationships between Diverse and Northland were going to cease as the work will have been performed, and there will be no ongoing work or revenues exchanged between the two entities. Hohm knew via first-hand observations while working on Diverse set-aside projects

(before and after Grimes' affirmation) that the affirmation was entirely false. Also, Relator

based upon his observations and conversations with senior Defendant managers, believes that

Grimes' affirmations were made to conceal Defendants' rent-a-vet scheme.

54.     However, the SBA administrative judge rendered a decision in February 2010

reversing the SBA size determination and concluded there were insufficient ties between

Diverse and Northland. The opinion concluded that the AO erred in finding an affiliation

under both the identity of interest and the totality of the circumstances standard. The

administrative judge's findings of fact were:

      i.    Seven Northland employees together own 49% of
Appellant. These individuals have no ownership
interest in Northland and are not key employees of
Northland.

      ii.   Appellant is managed by its 51% owner, Mr. Grimes,
who has sole and exclusive right to manage the
firm's business and has no prior connection with
Northland.

     iii.   Appellant has received two subcontracts from
Northland, which constitute approximately 9.5% of
Appellants receipts to date.

     iv.   Appellant has granted two subcontracts to Northland
on contracts represents 48.1% and 37.4% of the
value of these contracts.

      v.   Appellant and Northland have no common
ownership, management, facilities, equipment, or
employees. Northland has provided Appellant with
no financial assistance, indemnification or bonding,
and the two firms have never entered into a Joint
Venture or Teaming Agreement.

55.     Again, Hohm's direct firsthand knowledge, and as detailed below, proves that

the points i; ii, and v were factually inaccurate.

C. **Diverse was controlled and operated by Northland and Northland/JDS employees.**

  a. **Defendants created a shell office for Diverse.**

  56. The 2009 SBA size determination and subsequent appeal decision in February

2010, generated concern amongst Defendants that their rent-a-vet scheme might be uncovered.

Therefore, Defendants undertook several efforts to conceal their ongoing deception from the

Government.

  57. First, Defendants changed Diverse's ostensible headquarters location. Since its

foundation in November 2007 through to March 2010, Diverse reported to the Government its

physical address as 27115 Limestone Road, Redwood, New York. This address was a 26-acre

wooded undeveloped plot of land that was owned by Grimes and his wife, Martha. Also,

during this time frame, consistent with running a shell company, Defendants maintained all

Diverse business records at Northland's Liverpool headquarters.

  58. However, in March 2010 (one month after the SBA appeal decision),

Diverse's new address was first reported on a SDVOSB contract (ID # VA528RA0731),

which was valued at $1.24 million. The new "headquarters" was a former automotive repair

shop and was located at 25968 State Road 26, Plessis, New York.

  59. Next, Defendants recognizing the potential risk of an on-site audit by the SBA

(due to the SBA appeal), thus, decided to move copies of Diverse's business records to the

Plessis office. Shortly after securing the Plessis location, Tyler ordered the transport of the

records. Northland employee Jason Franklin ("Franklin"), an administrative employee was

tasked with moving the documents.

  60. Hohm received confirmation of this activity and the motivations behind it

from a conservation on or around April of 2016. He spoke with Gale Waldron Snyder ("Snyder") of Camillus, New York in her kitchen about the circumstances surrounding Diverse's business records and the reasons Franklin transported them to Plessis. Snyder no longer worked for Northland/JDS at the time of this conversation.

61.     While employed with Northland/JDS, Snyder was an Office Manager and she reported directly to Ray Swierk ("Swierk"), Northland's comptroller.  Part of Snyder's responsibilities entailed maintaining business records. Furthermore, in that role, she worked closely and on a daily basis with Swierk and Franklin.

62.     After setting up the shell office, Defendants next hired an administrative employee for the shell office. This employee was named Christina. She was hired to answer telephones and to serve as Diverse's sole employee that was assigned to work out of the Plessis location. Christine rarely interacted with Defendants' staff and had no impact on the management of Diverse. Instead, all Diverse personnel, administrative, and operational project decisions remained unchanged as they still originated from Northland and Northland/JDS employees working out of the Liverpool headquarters.

### b. Northland and Northland/JDS supplied Diverse with administration support, employees, and equipment.

63.     As alleged above, Grimes made multiple false assertions during the SBA appeal. One of the more blatantly false statements was that Diverse and Northland did not share "management, facilities, equipment, or employees."

### a)  Northland and Northland/JDS provide Diverse with administrative support.

64.     Northland's corporate office was the de facto nerve center for Diverse as all headquarters, supervisory personnel, and administrative activities originated from Liverpool.

In fact, Northland provided Grimes with a small office (located adjacent to Franklin's office) at their Liverpool office which was equipped with a white plastic folding table. Grimes used the office and desk for the purpose of signing all of the business documents necessary to facilitate the fraud. Additionally, Northland provided a mail slot for Grimes, which was also located adjacent to Franklin's office.

65.     Relator interacted daily with multiple headquarter supervisors including Michael McKenna ("McKenna"), Shanahan, and Scott Johnson ("Johnson"). Although these three individuals worked for Northland and Northland/JDS they exercised direct operational control over set-aside contracts for Diverse and the employees working on those projects.

66.     Northland's Chief Estimator, Ron Burlin ("Burlin"), was responsible for preparing set-aside bid responses for Diverse. On one occasion, Hohm observed Burlin mistakenly prepare an SDVOSB set-aside bid response on Northland letterhead. Upon noticing the mistake, Burlin chuckled, and then changed the letterhead to Diverse. Shortly thereafter, Burlin submitted the bid documents to the Government on Diverse's behalf. In March 2018, Burlin was listed as the contact for Diverse at internet website: https://govtribe.com/vendor/the-diverse-constrnction-group-llc-alexandria-bay-ny.

67.     Franklin, the Northland administrative employee who transported Diverse's business records from Liverpool to Plessis, was also responsible for preparing and distributing payroll checks for all Defendants' entities, including Diverse. Snyder also assisted Franklin with payroll issues. Employees working Diverse projects were required to contact either Franklin or Snyder if they encountered pay issues.  Checks were distributed on a weekly basis to field personnel in three ways: a) checks picked up at the Northland office by employees, b) checks sent by courier to project location, or c) checks distributed by supervisors.

68.     Relator witnessed such an incident when he was working with long-time Northland employee John Brown ("Brown"). Hohm and Brown were working on a Diverse set-aside project at the DVA Medical Center at Castle Point in 2010. Brown was experiencing substantial payroll issues, including missing hours. In an effort to resolve the problem, Brown called Snyder at the Liverpool headquarters multiple times over the course of several days. Relater vividly recalls this incident because Shanahan called Relator to complain about Brown, stating to Hohm, "we don't pay people to talk on the phone."

> b)     Northland produced payroll stubs, W2, and 401k documents for Diverse.

69.     Relator occasionally received two (2) paychecks, one (1) from Diverse and one (1) from Northland/JDS for work done on a single set-aside project during a single payroll period. An example of this occurred during the payroll period ending date of January 16, 2011 on the aforementioned Diverse set-aside Castle Point project.  This situation arose because at the time Hohm received employee benefits from Northland/JDS but not Diverse. Relator's benefits included medical insurance and a repayment for a 401k loan. Thus, Defendants split Hohm's weekly earnings on the set-aside project into two (2) paychecks, one from Diverse and the other from Northland/JDS, to ensure continued medical coverage and repayment of the loan.

70.     Hohm's Northland/JDS employee ID was number 1116 and his Diverse employee ID was number 30037. A review of the two (2) paystubs for this week show physical similarities which are consistent with originating from a single source. In comparing the documents, the following are identical: 1) font style, 2) font size, 3) format of the form, 4) format of name and dates, 5) presence of a similar stamped word located in the same place on the form (below Travel Pay), and 6) Relator is paid the same hourly rate, to the cent, for both

entities. These similarities are consistent with Northland's control over Diverse payroll operations.

71.     Defendants also issued Relator separate W2 and 401k program documents for Northland/JDS and Diverse. However, again like payroll, the W2 and 401k documents for Diverse were prepared and managed by Northland and Northland/JDS employees. The physical similarities between Relator's W2 forms from each Defendant company are again consistent with originating from a single source.  For example, an examination of Hohm's W2s covering the years 2009, 2012, 2013 and New York State Tax Form IT-2- Summary of W-2 Statements from 2010, again show striking physical similarities. First, the print font for 2012 and 2013 are the same for both entities. Second, the print font for 2009 matches both companies and is different from 2012 and 2013. Third, the use of all capitalization for words, the formatting, and spacing of Hohm's name, and the formatting of business and Relator's addresses are identical across both companies for 2009. Finally, both entities submitted hard copy forms in 2012, whereas both companies utilized an e-file form in 2013.

c)      <u>Northland and Northland/JDS supplied employees for Diverse<br>set side projects.</u>

72.     Below are three Diverse set-aside contracts which are representative of projects where Relator worked with Northland and Northland/JDS field crews. On each Diverse set-aside project, Northland:  1) assigned the employees, 2) supervised employees, 3) frequently paid employee salaries with Northland checks, 4) purchased supplies to complete the project, and 5) reimbursed employee field and trip expenses with Northland funds. Importantly, Hohm notes that even on the rare occasion when Grimes appeared on the jobsite, he did so for the sole purpose of attempting to show that he was falsely involved on the project. In fact, at no point, did Relator observe Grimes demonstrate any control over Diverse

operations.

73. **Castle Point DVA Medical Center**, Wappinger Falls. New York. This contract was awarded on September 24, 2008, under SDVOSB contract ID #VA243C0413. The contract had a total value of $7,208,135. The DVA received a total of seven (7) sealed bids for this project. Nonetheless, because of Defendants' false certifications, representations, and misleading activities, the DVA awarded the bid to Diverse.

74. The initial on-site project superintendent, Lee Weight, ("Weight") was a long-time employee for Northland. McKenna served as a project manager and he issued instructions and guidance from Northland's Liverpool office. Additionally, Todd Blair ("Blair"), another long-time Northland employee, served as on-site foreman. Besides McKenna and Weight, Blair also reported to Shanahan. Hohm eventually was named the on-site superintendent near the completion of the project, thus he had effective control over the day-to-day management of the project. He continued reporting and receiving instructions via telephone to McKenna and Shanahan back at the Liverpool headquarters.

75. Hohm worked on this project with approximately twenty (20) other Northland and Northland/JDS employees, including: Simon Lam, Brown, Jeff Case, Bob Piazza ("Piazza"), Brian Willis ("Willis") and Tom Powell ("Powell"). While on this project, Relator and other employees stayed at a Quality Inn Hotel, which is located at 849 New York Route 52, Fishkill, New York. Northland reimbursed Relator for all travel and lodging costs associated with this project. Hohm was assigned frequently to Castle Point from start to finish and recalls that Grimes seldom appeared on the job site nor he engage in any control over the project when on location.

76. **Albany DVA Medical Center**, Albany, New York. This contract was

awarded to Diverse on May 21, 2010, under SDVOSB contract ID # VA528RA0734 with a total contract value of $2,455,000. Again, the Government received multiple bids on this contract, but Defendants unlawfully won the award because of its fraudulent scheme.

77.     Weight was the on-site superintendent and additional Northland employees including but were not limited to Hohm, Piazza, Willis, Powell, and Warren Newman. The employees, including Relator, stayed at the Quality Inn, which is located at 1632 Central Avenue, Albany, New York. Northland reimbursed Relator for all travel and lodging costs associated with this project.

78.     At one point, Northland employees, including Relator, built prefabricated wooden framing at Northland's Liverpool headquarters and then shipped the framing to Albany for installation. Northland purchased the materials for the framing at two nearby stores located on Buckley Road in Liverpool, Kamco and C&R Supply.

79.     Similar to the Castle Point project, Hohm and other employees checked in with Shanahan via telephone. Relator was on this project regularly from start to finish. Grimes appeared only once or twice for mere show and did not control activities while on the site.

80.     **DOA Armory**, Rochester, New York. This Small Business set-aside contract was awarded to Diverse on April 5, 2011 (contract ID #W912QR11C00l) with a total value of $13,187,024. DOA received a total of six (6) bids, but again because of Defendants' fraudulent activities, the Government awarded the bid to Diverse.

81.     Northland employees Bob Miller ("Miller") was the on-site superintendent and Gary Baron was the overall project manager. Hohm worked on the contract under Miller's direct supervision and was essentially tasked with constructing and installing Styrofoam forms for pouring concrete.

82.     In total, there were approximately twenty (20) additional Northland employees on the job site to include Brown, James Hohm (Relator's son), Hanario Borba, and Dennis Baron. Hohm commuted from home every day on this project, however, other Northland employees stayed at local hotels. Grimes did not appear on the site nor he did not engage in any oversight while Relator was on the project.

> d)    Northland and Northland/JDS provided the equipment for
> Diverse set-aside projects.

83.     Hohm observed that Northland and Northland/JDS provided the equipment and tools that was used to perform the work on Diverse set-aside projects. In fact, Relator saw that Defendants had a limited number of vehicles with a Diverse logo. Also, of those vehicles, two (2) were white pickup trucks, and they were assigned to Grimes and Weight.  The spare keys to the pickup trucks were maintained by Maria, a Northland secretary, at the Liverpool office. Finally, the two pickup trucks, when not being used, were often parked and maintained at Northland's headquarters.

84.     In the fall of 2012, Tyler offered to sell one of the Diverse pickups, the one driven by Weight, to Relator for approximately $4,500. Hohm declined the offer after unsuccessfully negotiating a reduced price with Swierk. Relator noted that at no point was Grimes involved in the discussion on the sale of the truck, thus he received the distinct impression from both Tyler and Swierk that they had the authority to sell the vehicle to Relator.

85.     While on the Rochester Armory project, Miller had a Northland construction equipment trailer parked on-site. The trailer contained the hand tools needed to complete the work. Additionally, while working at the Castle Point and Albany projects, Relator and several other employees commuted to the project with a Northland stake rack, which is a lightweight

dump truck.

86.     On more than one occasion, Northland supervisors, including Shanahan,
instructed Hohm to refrain from driving any marked Northland vehicles onto Diverse projects.
Relator understood these instructions to mean that Defendants were trying to conceal that
Northland and Diverse were one and the same company. Shanahan told Hohm to park the
vehicle off-site in an inconspicuous location. These efforts to conceal included Shanahan
instructing Relator to remove Northland or Northland/JDS shirts while working on Diverse
set-aside project.

### D. Defendants made numerous false SDVOSB, HUBZone, and Small Business certifications and claims for payment.

87.     The above referenced three set-aside contracts are representative of the
numerous projects where Relator observed Defendants knowingly and fraudulently using
Northland and Northland/JDS employees, equipment, and resources to work Diverse projects.
Each of these projects were secured through Defendants' knowing and fraudulent
misrepresentation that Diverse was a qualified entity. In everything but name, Diverse was
Northland.

88.     Specifically, the set-aside certifications were false for two reasons: (1) the
aggregate annual revenue of Diverse and Northland exceeded the regulatory maximums for
satisfying the "small" size criteria required by 13 C.F.R. § 125.1 l(a), and (2) Grimes'
complete lack of control over Diverse failed to satisfy the "control" by a service-connected
disabled veteran criteria required by 13 C.F.R. § 125.l0(a). Further, with regards to the
HUBZone and Small Business certifications, the aggregate annual revenue of Diverse and its
affiliate Northland exceeded the regulatory maximums for satisfying the "small" size criteria

required by 13 C.F.R. § l26.200(b)(2); FAR 19.502.

89.     Hohm asserts that Grimes similarly had no control over the following

SDVOSB, HUBZone, and Small Business set-aside contracts, which were controlled and

performed by Northland and Northland/JDS personnel:

| Award ID | Date Signed | Type | Obligation |
|---|---|---|---|
| VA52814C0091 | 9/12/14 | SDVOSB | $6,097,480.77 |
| DTSLS513CC0893 | 9/31/13 | SDVOSB | $1,128,444.33 |
| VA52813C0088 | 4/26/13 | SDVOSB | $186,667.00 |
| VA52813C0075 | 4/25/13 | SDVOSB | $2,201,098.75 |
| VA52813P0712 | 3/28/13 | SDVOSB | $58,385.00 |
| VAS2813C0033 | 1/29/13 | SDVOSB | $2,009,529.82 |
| VA24312C0191 | 9/24/12 | SDVOSB | $169,000.00 |
| VA52812P0749 | 8/22/12 | SDVOSB . | $12,500.00 |
| VA52812PI013 | 8/22/12 | SDVOSB | $28,432.00 |
| VA52812C0152 | 7/17/12 | SDVOSB | $435,545.21 |
| VA52812P0563 | 7/9/12 | SDVOSB | $16,222.00 |
| VAS28C0894 | 6/9/11 | SDVOSB | $384,442.00 |
| VAS28C0852 | 5/27/11 | SDVOSB | $454,704.00 |
| VA528C0873 | 5/26/11 | SDVOSB | $48,206.00 |
| VA528C0837 | 5/13/11 | SDVOSB | $811,595.80 |
| VAS28C0834 | 4/18/11 | SDVOSB | $1,350,637.00 |
| W912QR11C0011 | 4/5/1 I | Small Business | $13,705,581.13 |
| VAS28RA0734 | 5/21/10 | SDVOSB | $2,562,850.01 |
| VA528RA073 1 | 3/31/10 | SDVOSB | $1,243,712.00 |
| W912PQ09C0045 | 9/30/09 | HUBZone | $9,305,882.00 |
| VAS28C0565 | 5125/09 | SDVOSB | $650,024.00 |
| VA101183B4C0031 | 6/13/08 | SDVOSB | $12,823,030.65 |
| VAS28C0733 | 1/3/13 | SDVOSB | · $1,l07,422.00 |
| VA243C0413 | 6/4/13 | SDVOSB | $511,135.57 |
| | | | $57,302,527.04 |

90.     The Government requested SDVOSB, HUBZone, and Small Business bid

proposals for each of the above contracts and identified the contract opportunities as set-asides

for certain NAICS industries. The governing regulations required that Diverse certify its

qualified status each and every time it submitted bids for the contracts listed above as well as

for the claims for payment in connection with those contracts.

91.     In conclusion, Defendants falsely certified Diverse as SDVOSB, HUBZone, or Small Business status each time Defendants bid on a set-aside contract and made claims for payment. As alleged above, Northland controlled all aspects of Diverse and used figurehead veteran owner Grimes to unlawfully win these set-aside contracts. Further, Defendants wholly controlled Diverse, and hid that fact because Defendants knew their aggregate revenues far exceeded the regulatory maximums for set-aside contracts. 13 C.F.R. § 121.201; 13 C.F.R. § 121.103(a)(l).

92.     The Government relied on Defendants' false certifications in awarding set-aside contracts and accepting Defendants' continued claims for payment. Relator estimates that Defendants' fraudulent actions caused at least $57 million in damages to the United States.

**E.  Defendants knew the certifications, bids, and claims submissions were false and material to the Government's decision to pay claims.**

93.     Hohm asserts based upon the details above that Defendants knew the certifications, bids, and claims submissions were false. Further, Relator asserts that besides having knowledge that they were committing fraud, Defendants also knew if the Government had knowledge of the true nature of Diverse's relationship with Northland and Northland/JDS, the Government would have stopped payment on the false claims.

94.     The best support for Hohm's assertion stems from the facts surrounding the 2009 SBA size determination. Based upon the SBA's initial finding, the Government didn't sit idly by and do nothing. Instead, the Government took immediate steps, which resulted in the SBA determining that Diverse was improperly affiliated with Northland. The effect of this decision would have prevented Diverse from securing future set-aside contracts and meant

Defendants' fraud scheme was over, resulting in no Government payments on future set-aside

contract. However, remarkably Defendants refused to abandon their fraud scheme. In fact,

Defendants countered with Grimes' blatantly false affirmation, which was used to counter the

SBA's determination of an improper affiliation.

95.     Thus, Defendants knew and demonstrated through their own actions that

unless they doubled down on the fraud by continuing to misrepresent the relationship between

Defendant entities, that the Government would refuse to pay Diverse for the fraudulent claims.

Although Defendants won this initial skirmish, they refused to merely rely on Grimes' false

affirmation and the favorable appeal decision. In fact, they began a systematic effort to further

conceal the relationship between Defendant entities from the Government. First, they created a

shell headquarters for their shell company.  Next they instructed Northland and Northland

employees to refrain from wearing Northland apparel or driving Northlands marked vehicles

onto Diverse set-aside projects. Finally, they had Grimes execute all of the necessary

paperwork (albeit done at Northland's headquarters) and also had him show up infrequently

but strategically on jobsites in order to give the false appearance that he was engaged and in

control of Diverse.

96.     All of this activity by Defendants was intentionally designed to prevent the

Government from learning the truth and is indicative that they knew they were engaged in

fraud against the Government. Also, Defendants knew the Government would have stopped

paying Defendants' fraudulent claims. However, at the end of the day, Defendants were able

to use the fraud scheme to win approximately $57 million in set-aside contracts.

97.     For Hohm, Defendants' culpability on the fraud scheme came into sharp

focus and crystalized in or about April 2016.  Besides the conversation with former Northland

employee Snyder (which is detailed above), Relator spoke with two former senior managers

Swierk (comptroller) and Johnson (project superintendent). Both Swierk and Johnson left

employment with Northland prior to the conversation with Relator.  The conversation occurred

in Swierk's condominium in Baldwinsville and was prompted by a local newspaper article that

announced the Government settled an FCA case against a Syracuse based construction

company in March. The allegations in the news article involved a SDVOSB and the use of a

rent-a-vet scheme to commit fraud against the Government.

98.     Because the allegations in the article essentially mirrored Hohm's, Swierk's,

and Johnson's observations and experiences with regards to Defendants, the conversation

ensued and Swierk and Johnson stated and/or confirmed the following main points regarding

the fraud scheme:

      i.    Tyler headed up the scheme;

      ii.   Tyler had control over Diverse and made all major
           final decisions with regards to Diverse;

      iii.  Grimes was a mere figurehead with no role in
           managing Diverse;

      iv.  Tyler and Northland were making millions off of the
           scheme; and

      v.    Tyler and senior managers within Defendant
           companies knew that the scheme to use Grimes
           status to head up Diverse was fraud against the
           Government.

## COUNT 1

## VIOLATION OF THE FEDERAL FALSE CLAIMS ACT: PRESENTATION
## OF FLASE CLAIMS
## (31 U.S.C. § 3729(a)(1)(A))

99.     Relator incorporates paragraphs 1 through 98 of this Complaint as though fully

set forth herein. This count sets forth claims for treble damages and forfeitures under the FCA.

100.     As described in greater detail above, Defendants knowingly submitted or

caused to be submitted false claims for payment on Federal set-aside contracts under

SDVOSBs, HUBZone, and Small Businesses programs, even though Defendants were

ineligible. Lawful status as an SDVOSB, HUBZone company, or Small Business is a specified

condition of payment under the contracts identified herein.

## COUNT II

### VIOLATIONS OF THE FALSE CLAIMS ACT: MAKING OR USING A FALSE RECORD OR STATEMENT (31 U.S.C. § 3729(a)(1)(B))

101.     Relator incorporates paragraphs 1 through 98 of this Complaint as though fully

set forth herein. 1hls count sets forth claims for treble damages and forfeitures under the FCA.

102.     As described in greater detail above, Defendants by knowingly making, using,

or causing to be made or used, a false record or statement material to a false or fraudulent

claim that were made to the Government.

## COUNT III

### VIOLATIONS OF THE FALSE CLAIMS ACT: BY CONSPIRING TO COMMIT A VIOLATION OF 31 U.S.C. § 3729(a)(1)(A) AND 31 U.S.C. § 3729(a)(1)(B) (31 U.S.C. § 3729(a)(1)(C))

103.     Relator incorporates paragraphs 1 through 98 of this Complaint as though fully

set forth herein. This count sets forth claims for treble damages and forfeitures under the FCA.

104.     As described in greater detail above, Defendants knowingly conspired to

commit a violation of 31 U.S.C. § 3729(a)(l)(A) and 31 U.S.C. § 3729(a)(l)(B).

105.     Because of Defendants' false claims, the United States has suffered and

continues to suffer damages and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each such claim submitted.

## COUNT IV

## COMMON LAW FRAUD

106.    Relator incorporates paragraphs 1 through 98 of this Complaint as though fully set forth herein. This count sets forth claims for treble damages and forfeitures under the FCA.

107.    As described in greater detail above, Defendants knowingly made material misrepresentations of fact, with knowledge of their truth, in connection with the claims for payment submitted by, or on behalf of, Defendants to the United States. Defendants intended that the United States rely upon the accuracy of the false representations referenced above. The United States made substantial payments of money in justifiable reliance upon Defendants' false representations.  Defendants' actions caused the United States to be damaged in a substantial amount to be determined at trial.

## COUNT V

## UNJUST ENRICHMENT

108.    Relator incorporates paragraphs 1 through 98 of this Complaint as though fully set forth herein. 1hls count sets forth claims for treble damages and forfeitures under the FCA.

109.    By reason of the payments to Defendants, Defendants were unjustly enriched. The circumstances of Defendants' receipt of the contracts at issue are such that, in equity and good conscience, Defendants are liable to account for and pay such amounts, which are to be determined at trial.

## PRAYER FOR RELIEF

Wherefore Relator James Hohm, on behalf of the United States,

respectfully requests that:

    i.    This Court enter an order declaring that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

    ii.    This Court enter an order requiring Defendants to pay an amount equal to three times the amount of damages to the United States;

    iii.    This Court enter an order requiring Defendants to pay the maximum civil penalties for each such false or fraudulent claim;

    iv.    This Court enter an order awarding Relator James Hohm the maximum statutory award for his contributions to the prosecution of this action pursuant to 31 U.S.C. § 3730(d);

    v.    This Court enter an order requiring Defendants to pay all expenses, attorneys' fees and costs associated with this action pursuant to 31 U.S.C. §3730(d)(l); and

    vi.    Any and all other relief as this Court determines to be just and proper.

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury on all counts.

Dated November 8, 2019

            Respectfully submitted,

BOLTON LAW, PLLC

CLARK J. BOLTON
Florida Bar No.: 1008047
Lead Counsel for Plaintiff/Relator

8270 Woodlands Center Boulevard
Tampa, Florida 33618
Tel.: 813-649-3005
E-Mail: cbolton@boltonlawpllc.com

KWALL BARACK NADEAU PLLC

RYAN BARACK
Florida Bar No.: 148430
Counsel for Plaintiff/Relator

304 South Belcher Road Suite C
Clearwater, Florida 33765-3900
Tel.: 727-441-4947
E-Mail: rbarack@employeerights.com

CAPEZZA & HILL, L.L.P.

THOMAS A. CAPEZZA
New York Bar Roll No.: 503159
Local Counsel for Plaintiff/Relator

30 South Pearl Street, Suite P-110
Albany, New York 12207
Tel.: 518 478 6065
E-Mail: tom@capezzahill.com